123 P.3d 698

**Kenneth A. HAFLICH,**
**Plaintiff/Counterclaim**
**Defendant–Appellee,**

v.

**Elizabeth HAFLICH,**
**Defendant/Counterclaimant–Appellant**

and

**Elizabeth Haflich, Third–Party**
**Plaintiff–Appellant,**

v.

**Judith Haflich**

and

**Edward Haflich, Third–Party**
**Defendants–Appellees.**

**No. 26277.**

Intermediate Court of Appeals of Hawai'i.

Oct. 28, 2005.

Meyer M. Ueoka, Wailuku, (Ueoka & Ueoka), on the briefs for Defendant/Counterclaimant and Third–Party Plaintiff–Appellant.

James H. Fosbinder, Kahului, and Rhonda M. Fosbinder (Fosbinder & Fosbinder), on the briefs for Plaintiff/Counterclaim Defendant–Appellee and for Third–Party Defendants–Appellees.

BURNS, C.J., LIM and FOLEY, JJ.

Opinion of the Court by BURNS, C.J.

Defendant/Counterclaimant and Third–Party Plaintiff–Appellant Elizabeth Haflich, now known as Elizabeth Spano (Elizabeth or Defendant), appeals from the following judgment and order entered in the Family Court of the Second Circuit:[1] (1) the September 26, 2003 Judgment Granting Divorce and Awarding Child Custody; Order Dismissing Third–Party Complaint (September 26, 2003 Divorce Decree); and (2) the December 12, 2003 Order on Motion for New Trial Pursuant to HFCR Rule 59(a) and/or for Reconsideration or Amendment of Judgment and Order Pursuant to HFCR Rule 59(e) (December 12, 2003 Order).

We vacate in part and remand for further proceedings and action consistent with this opinion. We affirm in all other respects.

## BACKGROUND

Elizabeth and Plaintiff/Counterclaim Defendant–Appellee Kenneth A. Haflich (Kenneth) were married in California on January 27, 1996. Their first son was born on July 30, 1997, and their second son was born on August 15, 2000.

In April 2001, Elizabeth obtained a three-year protective order against Kenneth in the Family Court of the Second Circuit, State of Hawai‘i, in FC–DA No. 01–1–0180.

On April 6, 2001, Kenneth filed a complaint for divorce. On April 26, 2001, Elizabeth filed a counterclaim for divorce.

On May 10, 2001, Judge Eric G. Romanchak entered an Order on Plaintiff's and Defendant's Motions for Pre–Decree Relief Filed on April 9 and 17, 2001 awarding Elizabeth temporary sole legal and physical custody of the two children and ordering in relevant part:

---

1. Judge Eric G. Romanchak presided.

2. *Visitation*—Plaintiff shall have visitation with the minor children on Tuesdays and Thursdays from 4 p.m. until 6:30 p.m. and Saturdays from 8 a.m. until 11 a.m., beginning April 26, 2001. Pick up and drop off of the children will occur at the home of Defendant's sister, Kathleen Spano, and will comply with the provisions of the First Amended Protective Order, FC–DA 01–1–0180.

3. *Amending Protective Order*—Defendant shall amend her Protective Order to remove Kathleen Spano and include the aforementioned visitation arrangement.

. . . .

5. *Guardian Ad Litem*—The parties agree to appoint a Guardian Ad Litem in lieu of a Social Study to investigate the custodial and visitation issues, including Defendant's desire to move to the mainland. Plaintiff agrees to incur the cost of the GAL.

6. *Family Support*—Plaintiff shall pay to Defendant the sum of $1200 per month for family support. Payment should be made in two installments of $600 on the first and fifteenth of the month.

7. *Imputed Income to Defendant*—The Court is not imputing income to Defendant at this time.

On September 18, 2002, the court entered its Order Appointing [Jacque Ford] Guardian Ad Litem by Stipulation.

On September 16, 2002, Elizabeth filed a Motion for Leave to File Third–Party Complaint against Kenneth's parents, Edward and Judith Haflich (September 16, 2002 Motion). In the motion, Elizabeth stated, in relevant part:

Such a claim is necessary because Plaintiff's parents hold the property located at 552 Kumulani Drive, Kihei, Maui, Hawaii 96753 in constructive trust and/or in resulting trust for Plaintiff and Defendant. Thus, it is necessary to name Plaintiff's parents as Third–Party Defendants in order for this Court to finally divide and distribute the estate of the parties pursuant to HRS § 580–47(a)(3).

This motion is brought pursuant to HRS §§ 571–14, 580(a)(3), and 580–47(a)(3) and Rules 7 and 14 of the Hawaii Family Court Rules[.]

In an affidavit accompanying the September 16, 2002 Motion, Elizabeth stated, in relevant part, as follows:

3. On or around early in the year 1998, Plaintiff and I decided that we wanted to purchase property. . . .

4. I contacted a Realtor, James Wagner, of James Wagner Realty regarding purchasing property. Sometime in Spring 1998, Mr. Wagner showed me the property located at 552 Kumulani Drive, Kihei, Maui, Hawaii 96753 for $220,000.00.

5. After negotiating for the purchase, Plaintiff and I signed a DROA [Deposit, Receipt, Offer and Acceptance] and counter offer for $220,000.00 for the subject property. . . . We deposited $9,000.00 as earnest money pursuant to the DROA.

6. Unfortunately, when we went to get the loan, we were denied. Therefore, Plaintiff contacted his parents and asked them if they would help us buy the property.

7. Plaintiff's parents agreed and helped us purchase the property by putting down approximately $42,000.00 for the down payment and signing for the mortgage note. . . .

8. The agreement that Plaintiff and I had with Plaintiff's parents was that in exchange for their assistance in helping us buy the house, they could live in a cottage on the property upon their retirement.

9. Plaintiff's parents have verbally acknowledged to me that the property belongs to Plaintiff and me.

10. However, without my consent, when the property [sic] closed, the deed was placed in Plaintiff's parents' names only[.]

11. I was surprised and upset that Plaintiff's and my name was [sic] not on the deed. I expected that my name would be on the property. In fact, in escrow, the title company did a lien check on all of us. . . .

12. Plaintiff and I have always made the mortgage payments. Each month, we paid to Plaintiff's parents the sum of $1300.00 per month. . . . In addition, beginning in

1999 and for all other tax years, Plaintiff and I took as a deduction, the mortgage interest payments we made. . . .

13. To my knowledge, Plaintiff's parents never made any mortgage payments on the property. This is true, even though they have moved on to the property and lived in one of the cottages.

14. In addition to making the mortgage payments, Plaintiff and I have made all of the payments for the water bills, the refuse collection, termite service and the electric bills. . . .

15. After we purchased the property, Plaintiff and I built another cottage on the property. We spent approximately $20,000.00 to clear blue rock off the property and approximately $30,000.00 in materials for the cottage. Plaintiff is a contractor, so Plaintiff and I supplied the labor to build the cottage. Plaintiff's parents also contributed to the material costs of building the cottage. Plaintiff's parents now live in that new cottage.

16. Furthermore, Plaintiff and I renovated the existing cottage on the property at our own expense, new appliances, carpeting, enclosing the carport and landscaping the property.

17. For all of the foregoing reasons, I am asserting an interest in the property located at 552 Kumulani Drive, Kihei, Maui, Hawaii and am requesting that this Court grant my motion to name Plaintiff's parents as Third Party Defendants.

There is no order in the record deciding Elizabeth's September 16, 2002 Motion.

On March 21, 2003, Elizabeth filed a third-party complaint against Kenneth's parents, Judith and Edward Haflich, alleging that although Kenneth's parents have record title [2] to the residence at 552 Kumulani Drive, Kīhei, Maui, Hawai'i, Kenneth's parents "agreed that the property was to belong to Defendant and Plaintiff" and, therefore, "Defendant and Plaintiff are the rightful owners of the subject property." Count One alleged a "Resulting Trust", Count Two alleged a "Constructive Trust", and Count Three alleged "Fraud" and sought a conveyance of the property and the award of special, general, and punitive damages.

On April 28, 2003, the Report of Guardian Ad Litem was filed. It offered the following two possibilities:

### Plan A

Elizabeth will be allowed to relocate and Ken will purchase a home for himself in the Boston area. He will remain on Maui and operate his Construction Company but he will travel to Boston as frequently as his time allows. . . .

The children will also fly to Maui for (2) months out of the summer. . . . Both parents must be responsible for splitting the costs of these airline tickets. The Christmas Holiday must also be shared equally. . . . Finally, during Spring break the boys will also share this break evenly between the two households. . . .

### Plan B

Elizabeth is not allowed to relocate until Keegan is (5) years old. Ken does put money down on a home for her and the boys and she is allowed to sale [sic] this home and keeps the profit and relocates in (5) years. Elizabeth would complete her paralegal degree and work part time as a hairdresser. The boys visit with their dad every Thursday at 3:00 PM and they spend the night with him and remain him [sic] his care until Sunday morning at 9:00 AM. . . . The above holiday and vacation schedule would also apply with Plan B.

At the trial, the court stated that it "will take judicial notice of all filed documents in the FC-DA file concerning the ex parte application for a TRO, and the granting of the protective order, and the amended protective order."

At the trial, Kenneth testified, in relevant part:

A. I'm willing to do whatever it would take to help her secure a home here. Like

**2.** According to Exhibit VVV in evidence, the "record title" to 552 Kumulani Drive, Kīhei, Maui, Hawai'i, is a Bureau of Conveyances title, Hawaii Revised Statutes, HRS Chapter 502 (Supp.2004), not a Land Court title, HRS Chapter 501 (Supp.2004).

I said before, and I'm willing to stand behind that if that means—and going selling [sic] my truck to give her something to help her secure a home, I'll do that in a minute, if that means my kids stay here. I'll do whatever it takes.

At the trial, Elizabeth testified that she would be able to obtain her "paralegal credentials" and "certificate" when she completed an "Ashworth College" "two year" "home course" taken by "mail".

After a trial on May 22, 2003, August 28, 2003, and August 29, 2003, the court entered the September 26, 2003 Divorce Decree awarding Elizabeth sole legal and physical custody of the children, denying Elizabeth's request to relocate with the children to Maine, awarding Kenneth visitation commencing each Friday afternoon and ending each Monday morning, ordering that the parties shall alternate and equally share the children's birthdays, summer, winter, and spring recesses, and Easter, Thanksgiving and Halloween holidays, and ordering that the children shall spend Father's Day and Kenneth's birthday with Kenneth, and Mother's Day and Elizabeth's birthday with Elizabeth.

The September 26, 2003 Divorce Decree noted that Elizabeth was working on weekends. It did not say where, or during what hours, or for how much Elizabeth was working. For purposes of calculating child support and determining spousal support, the court imputed Elizabeth's income to be $12 per hour, 40 hours per week, 52 weeks a year or $2,080 per month, and found that Kenneth's income was $7,529 per month. The court ordered: (a) Kenneth to pay Elizabeth $2,370 per month ($1,000 per month spousal support and $1,370 per month child support); (b) Kenneth to maintain medical and dental coverage for the children; (c) each party to pay one-half of any medical and dental expenses not covered; (d) each party to pay his or her own attorney fees and costs; and (e) that Elizabeth shall resume the use of her former name "Elizabeth Spano". The court also denied Elizabeth's Third–Party Complaint.

On October 6, 2003, Elizabeth filed a Motion for New Trial Pursuant to HFCR Rule 59(a) and/or for Reconsideration or Amendment of Judgment and Order Pursuant to HFCR Rule 59(e) (October 6, 2003 Motion). In this motion, Elizabeth challenged the orders imputing her income at the rate of $12 per hour for 40 hours per week, denying her request to relocate with the children to Maine, and denying her Third–Party Complaint. In an accompanying Declaration, Elizabeth stated, in relevant part:

3. I am currently unemployed.

4. I am unable to find employment here on Maui where I can make $12 per hour and still care for my young children.

. . . .

9. I have been unable to find suitable housing since the trial in this matter. The condominium in which I was living was sold and I was asked to leave as the new owner intends to occupy the unit.

. . . .

12. I believe that this court ... should take additional testimony and arguments regarding the promise by the Third–Party Defendants regarding the purchase of the property. Third–Party Defendants promised that they would be purchasing said property in all of our names to help us purchase the property in Maui Meadows. Plaintiff and I relied on that promise in going forth with the improvements on the property and providing the purchase money for the property.

The Order entered on December 12, 2003 denied Elizabeth's October 6, 2003 Motion.

Elizabeth filed a notice of appeal on December 12, 2003. The court entered its Findings of Fact; Conclusions of Law (FsOF and CsOL) on May 20, 2004. This appeal was assigned to this court on January 19, 2005.

The FsOF and CsOL state, in relevant part:

### CUSTODY

. . . .

16. Historically, Plaintiff's work schedule has prevented him from spending extensive time with the children.

17. Plaintiff and Defendant have a contentious relationship which limits their ability to effectively communicate about legal issues regarding the children.

18. Although Plaintiff alleged that Defendant inappropriately disciplines the children and that she does not provide a fit and appropriate home, this Court does not find those allegations to be credible.

. . . .

20. This Court finds that the minor children have a loving relationship with both parents.

21. Both parents are good parents.

. . . .

23. This Court finds that it is in the children's best interests that Defendant be awarded sole legal and sole physical custody of the minor children.

### RELOCATION

. . . .

26. In her report, the GAL did not make a specific recommendation regarding relocation. Rather the GAL provided alternatives for this Court.

27. However, the GAL testified at the trial that she believed that the children were too young to be relocated from the Island of Maui to Maine away from their father.

28. The GAL testified that the children needed more time to bond with their father before any relocation should take place.

. . . .

30. This Court has considered Defendant's proposed relocation plan which includes a large family support system, a possible job paying $12.00 per hour, a home on her sister's property and schooling for the children.

. . . .

32. The Court finds that the minor children's young ages and their need to bond with their father at this time outweighs Defendant's comprehensive relocation plan.

33. This Court has made appropriate financial provisions for Defendant and the minor children which are intended adequately provide for their needs while living on Maui.

34. At this time, it is not in the minor children's best interests that Defendant be permitted to relocate to Maine with the minor children.

### VISITATION

35. This Court finds that Plaintiff has made appropriate adjustments in his work schedule and child care arrangements which would allow him to care for the children on weekends and during the summers.

36. Defendant currently only works during weekends.

37. It is appropriate that if either party's work schedule changes that the schedule should change to allow them to share non-school time equally.

38. This Court's parenting plan, as set forth in the Judgment, provides for the safety of the Defendant and the minor children notwithstanding the protective order and finding of family violence against Plaintiff in FC–DA No. 01–1–0180.

39. It is in the best interests of the minor children that Plaintiff have regular, consistent visitation with the minor children and that the parties' share the children's school vacations, holidays, and special events.

### PLAINTIFF'S INCOME

. . . .

45. Exhibit "AAAAA" reveals that Plaintiff had gross revenues of $584,745.84 and net income after expenses of $50,262.04 for the 51 weeks immediately prior to the conclusion of the trial in this matter.

46. This Court finds that some of the expenses listed on Exhibit "AAAAA" are expenses or expenses which will

be refunded to Plaintiff and thus should be added back into his net income in order to find a more accurate accounting of Plaintiff's income.

47. The expenses which should be added back into Plaintiff's stated income on Exhibit "AAAAA" are as follows:

a. Automobile Expenses (1/2 of $3,399.61)  $ 1,699.81
b. Fuel (1/2/of $1,471.14)  734.57
c. Health Insurance  8,611.98
d. Homeowner's Association Fees  10,000.00
e. Vehicle Insurance (1/2 of $1270.00)  635.00
f. Miscellaneous (Sharon Courter)  5,925.46
g. Rent/Lease  9,242.46
h. Telephone (1/2 of $3,064.97)  1,532.49
i. Gas and Electric  1,713.93

46. The entire amount of expenses which should be added back to Plaintiff's Net Income is $40,095.70.

47. Thus, the total amount of Plaintiff's gross income for the year is $90,356.74 which equals an average of $7,529.73 gross monthly income.

48. This Court finds that Plaintiff's gross monthly income for the purposes of calculating child support is $6,529.73, which accounts for payment by Plaintiff to Defendant of $1,000.00 per month for alimony.

### DEFENDANT'S INCOME

49. Although Defendant testified that she is receiving welfare benefits, her children have attained an age where this Court finds she is able to work full time.

50. Defendant testified that she was a licensed hairdresser prior to the birth of her children.

51. Defendant also testified that she has a job offer in Maine for $12.00 per hour.

52. Although this Court has denied Defendant's request to relocate to Maine, it is reasonable to imput income to Defendant at a rate of $12.00 per hour, assuming a 40 hour work week or $2080.00 per month.

### CHILD SUPPORT

53. Assuming that Defendant returns to work full-time, it is estimated that her monthly child care expenses will equal $300.00 per month.

54. Plaintiff pays for the children's medical insurance at a rate of $400 per month.

55. For the purposes of calculating child support, $1000 per month is added to Defendant's income to equal $3080.00.

. . . .

### ALIMONY

. . . .

59. By agreement of the parties, Defendant has not worked outside the home since the birth of the parties' oldest child, . . . .

. . . .

61. Defendant testified that she will seek to complete her paralegal education and certification.

62. Defendant needs transitional alimony to allow her to complete her education and reenter the workforce.

63. . . . [I]t is appropriate that Defendant be awarded transitional alimony for a period of three years.

64. Plaintiff's has income sufficient income to provide for transitional alimony which will allow Defendant to provide a home on Maui and a standard of living substantially equal to the standard of living the parties enjoyed during the marriage.

65. This Court assumes that after one year, Defendant will be able to obtain employment at a rate higher than $12.00 per hour and thus it is appropriate to reduce alimony in the second and third year by $250.00 per month.

66. This court anticipates that Defendant will have gross income of $2080.00 per month and child support of $1370.00 per month. It is appropriate that Defendant receive an additional sum of $1000.00 per month in transitional alimony for the first year and $750.00 per month in the two subsequent years.

. . . .

### REAL PROPERTY/THIRD–PARTY COMPLAINT

80. Third–Party Defendants are the owners of record of the real property located at 552 Kumulani Drive, Kihei, Maui, Hawaii.

81. Sometime in Spring 1998, Plaintiff and Defendant began to look for real property to purchase.

82. However, after identifying a parcel of property [to] purchase at 552 Kumulani Drive, Kihei, Maui, Hawaii, it was established that Plaintiff and Defendant did not have the requisite downpayment to purchase the property, nor did they have the requisite credit rating to qualify for a mortgage loan to be able to purchase the property.

83. Plaintiff and Defendant then contacted Third–Party Defendants regarding the purchase of the real property which they were unable to purchase on their own.

84. Third-party Defendants signed a contract for the purchase of the property, a DROA, along with Plaintiff and Defendant and the initial escrow documents listed Plaintiff and Defendant as owners of the property along with Third–Party Defendants.

85. Notwithstanding the DROA and initial escrow documents, the Deed conveyed the property to only the Third–Party Defendants as owners of the property.

. . . .

87. A new first loan of $175,000.00 was in Third–Party Defendants' names only.

88. The balance of the purchase price, of $51,909.92 was paid solely by Third–Party Defendants, with the exception of a $10,000.00 earnest money deposit paid by Plaintiff and Defendant.

89. After the purchase of the property Plaintiff and Defendant lived in the primary residence on the real property and made improvements to the real property.

90. Plaintiff and Defendant made payments to Third–Party Defendants in the amount of $1300.00 each month.

. . . .

92. This court finds that said payments were rent paid by Plaintiff and Defendant while living on the property.

93. Defendant claimed that during the marriage, Plaintiff and Defendant spent more than $26,587.05 improving the property, not including the cost of labor.

94. Third–Party Defendants testified that any money paid by Plaintiff and Defendant for the earnest money down payment on the property, to build the cottage and otherwise improve the property was repaid to Plaintiff and Defendant.

95. Third–Party Defendants paid for the construction of a cottage on the property where they intended to live.

96. Within a few months of the completion of the construction of the cottage, Third–Party Defendants moved to the property.

. . . .

104. Notwithstanding the confidential relationship between Third–Party Defendants and Plaintiff and Defendant, Defendant has not provided clear and convincing evidence that Third–Party Defendants promised to hold the real property, or any portion of it, for the benefit of Plaintiff and Defendant.

105. Third-party Defendants provided virtually all of the funding to purchase the real property.

106. Defendant has not shown by clear and convincing evidence that Third–Party Defendants will be unjustly enriched by virtue of their retention of full ownership of the property.

(Footnotes omitted; sics omitted.)

### DISCUSSION

#### A.

At the trial, Elizabeth contended that it was in the best interest of the children that she and they relocate because (1) the threat of abuse and the criticism by Kenneth's parents were adversely affecting Elizabeth's

emotional stability and (2) Elizabeth cannot afford to live in Hawaiʻi. On appeal, Elizabeth contends that "the Trial Court erred by denying Elizabeth [permission] to relocate to the mainland with the two minor children, though family violence was committed by Kenneth, who has a history of violence." Upon a review of the record, we conclude that this point has no merit.

### B.

Elizabeth contends that "the Trial Court erred and abused its discretion in allowing Kenneth to have unsupervised visitation, though Kenneth, who has a history of violence, committed family violence."

Hawaii Revised Statutes (HRS) § 571–46 (Supp.2004) states, in relevant part:

§ 571–46 **Criteria and procedure in awarding custody and visitation.** In the actions for divorce, separation, annulment, separate maintenance, or any other proceeding where there is at issue a dispute as to the custody of a minor child, the court, during the pendency of the action, at the final hearing, or any time during the minority of the child, may make an order for the custody of the minor child as may seem necessary or proper. In awarding the custody, the court shall be guided by the following standards, considerations, and procedures:

(1) Custody should be awarded to either parent or to both parents according to the best interests of the child;

. . . .

(7) Reasonable visitation rights shall be awarded to parents, grandparents, siblings, and any person interested in the welfare of the child in the discretion of the court, unless it is shown that rights of visitation are detrimental to the best interests of the child;

. . . .

(9) In every proceeding where there is at issue a dispute as to the custody of a child, a determination by the court that family violence has been committed by a parent [3] raises a rebuttable presumption that it is detrimental to the child and not in the best interest of the child to be placed in sole custody, joint legal custody, or joint physical custody with the perpetrator of family violence. In addition to other factors that a court must consider in a proceeding in which the custody of a child or visitation by a parent is at issue, and in which the court has made a finding of family violence by a parent:

(A) The court shall consider as the primary factor the safety and well-being of the child and of the parent who is the victim of family violence;

(B) The court shall consider the perpetrator's history of causing physical harm, bodily injury, or assault or causing reasonable fear of physical harm, bodily injury, or assault to another person; and

(C) If a parent is absent or relocates because of an act of family violence by the other parent, the absence or relocation shall not be a factor that weighs against the parent in determining custody or visitation;

(10) A court may award visitation to a parent who committed family violence only if the court finds that adequate provision can be made for the physical safety and psychologi-

**3.** The family court's issuance of a temporary restraining order pursuant to Hawaii Revised Statutes (HRS) § 586–4 (Supp.2004) upon proof of probable cause, and/or issuance of a protective order pursuant to HRS § 586–5.5 (Supp.2004) upon a finding "that the respondent has failed to show cause why the order should not be continued and that a protective order is necessary to prevent domestic abuse or a recurrence of abuse," may or may not be the "determination by the court that family violence has been committed by a parent" referred to in HRS § 571–46(9) (Supp.2004), or the proof of "a parent who committed family violence" referred to in HRS § 571–46(10) (Supp.2004). In this case, it appears that the family court resolved this ambiguity when it concluded, in finding of fact no. 38, that there was a "finding of family violence against Plaintiff in FC–DA No. 01–1–0180[.]"

cal well-being of the child and for the safety of the parent who is a victim of family violence[.]

(Footnote added.)

Elizabeth contends that

[b]ecause of family violence committed by [Kenneth], who has a history of family violence, the trial court made the mistake by allowing unsupervised visitation in the parenting plan, making H.R.S. 586 meaningless and absurd. A perpetrator of family violence will be allowed visitation only when adequate provision for the physical safety and psychological well-being of the children and adequate safety of a parent who is a victim of family violence can be made, HRS Section 571–46(10). Here no such provision [sic] were made for the safety of the children and [Elizabeth][.]"

Upon a review of the record, and in light of FsOF nos. 20, 21, and 38, and notwithstanding FOF no. 17, we conclude that this point has no merit.

### C.

■ Elizabeth contends that the family court erred in denying her Third–Party Complaint. We conclude that the family court erred in adjudicating her Third–Party Complaint. Jurisdiction is "the base requirement for any court considering and resolving an appeal or original action," *Wong v. Wong,* 79 Hawai'i 26, 29, 897 P.2d 953, 956 (1995) (citing *Pele Defense Fund v. Puna Geothermal Venture,* 77 Hawai'i 64, 69 n. 10, 881 P.2d 1210, 1215 n. 10 (1994)), and "refers to the power of the court to decide a matter in controversy and presupposes the existence of a duly constituted court with control over the subject matter and the parties." *State v. Kwak,* 80 Hawai'i 297, 301, 909 P.2d 1112, 1116 (1995) (citation and internal quotation marks omitted). "The family court is a court of limited jurisdiction and, as such, derives its authority from the statutes that created it. *See Cleveland [v. Cleveland],* 57 Haw. 519] 520, 559 P.2d [744] 746 [ (1977) ]; *In re Doe,* 86 Hawai'i 517, 520, 950 P.2d 701, 704 (App.1997)." *In Re Doe Children,* 105 Hawai'i 38, 61, 93 P.3d 1145, 1168 (2004). No statute gives the family court subject matter jurisdiction to adjudicate a third-party com-

plaint asserted by the defendant in a divorce case against the parents of the plaintiff which alleges that the title to a house and lot in Hawai'i should be in the name of plaintiff and defendant but is in the name of plaintiff's parents as a result of their breach of contract or fraud and seeking the imposition of a "Resulting Trust" or a "Constructive Trust", or a conveyance of the property and the award of special, general, and punitive damages.

Elizabeth cites Hawai'i Family Court (HFCR) Rule 14 (2005) which states:

**Third-party practice.**

(a) *When parties may bring in third-party.* A party to the action may cause a third-party to be brought in only in the event that property rights of such third-party may be affected or such third-party has or may have an interest in the custody or visitation of a minor child of a party to the action. The party seeking to bring in a third-party defendant shall file a motion for leave to file a third-party complaint together with an affidavit and notice in accordance with Rule 7(b)(1). The person served with the summons and third-party complaint, hereinafter called the third-party defendant, shall make any defenses to the third-party complaint as provided in Rule 12. The third-party defendant may also assert any claim against the plaintiff or defendant arising out of the transaction or occurrence that is the subject matter of the complaint.

■ We conclude that the statement in HFCR Rule 14 that "[a] party to the action may cause a third-party to be brought in only in the event that property rights of such third-party may be affected" refers to situations where the family court case may affect the property rights of the third-party. Here, the divorce case between Elizabeth and Kenneth could not have affected the property rights of Kenneth's parents. It was the third-party complaint that sought to affect the property rights of Kenneth's parents.

### D.

■ Elizabeth contends that "the Trial Court erred in imputing ... Elizabeth's

hourly income at $12.00/an hour, and using that figure in calculating the Child Support Guideline and alimony." We agree.

It appears that FOF no. 50 is clearly erroneous.

It appears that FOF no. 52 is based on FOF no. 51. If so, it is wrong. It is not reasonable to assume a person who has a job offer in Maine for $12.00 per hour also has a job offer in Maui, Hawai'i, for $12.00 per hour.

According to FsOF nos. 33 and 64, the family court's intent was to allow Elizabeth to provide a home on Maui for herself and the children and enjoy a standard of living substantially equal to the standard of living she, Kenneth, and the children enjoyed during the marriage. The FsOF fail to indicate the basis for the court's implicit finding that its calculations would accomplish this result. Without that basis, we cannot determine the validity of this implicit finding.

According to FsOF nos. 52, 65, and 66, the court based its financial calculations on the assumptions that during the first year Elizabeth should be employed at $12 per hour for 40 hours per week, and after the first year she should be employed at higher than $12 per hour. Other than FOF no. 52, which appears to be wrong, the record does not reveal any basis for these assumptions. Therefore, FsOF nos. 65 and 66 appear to be erroneous assumptions.

Neither the evidence nor the court indicate where and when on Maui Elizabeth could or would be working during the first year at $12 per hour for 40 hours per week. FsOF nos. 62 and 63 indicate that Elizabeth needs three years of transitional alimony to allow her to complete her education and re-enter the workforce. The findings do not answer the questions of how Elizabeth can work for 40 hours per week at $12 or more per hour, care for the children, and complete her education.

Moreover, the September 26, 2003 Divorce Decree assumes that Elizabeth will be working on weekends. It states, in relevant part:

6. *Parenting Plan.* The Court finds that it is in the best interest of the minor children to adopt the following parenting plan:

A. *School Year.* During the school year the parties shall share a weekly access schedule as follows: Plaintiff shall pick up the minor children on Fridays after school and they shall remain in his care until Monday morning when Plaintiff will take [the older son] to school and [the younger son] to the Defendant or to day care. Defendant shall have the minor children from Monday through Friday. Defendant will pick up [older son] after school on Monday and drop him off at school on Friday mornings. Defendant will either receive [younger son] from the Plaintiff Monday morning or from day care on Mondays. Defendant may either keep [younger son] on Fridays or take him to day care until Plaintiff picks him up after [older son] is finished with school on Fridays. The parties shall agree on appropriate child care to accommodate their work schedules. The aforementioned schedule best suits the parties current work schedules with the Defendant working weekends. If the parties['] work schedules change, the parties shall revise the parenting plan so that both parents have equal time with the children when they are not in school and the parents are not working (i.e. weekends).

We note in passing that the "shall agree" and "shall revise" parts of the above paragraph appear to ignore FOF no. 17.

## E.

Elizabeth contends that "the Trial Court erred by failing to include in Kenneth's annual gross income the amount of repayment made to Judith and Edward out of the business account for the loans obtained by Kenneth to pay for business expenses." Upon a review of the record, we conclude that this point has no merit.

## F.

Elizabeth contends that "the Trial Court abused its discretion in denying Elizabeth's Motion for New Trial and Reconsideration." Elizabeth's motion was based on the points discussed above. Therefore, this point has already been answered.

## CONCLUSION

Accordingly, we vacate the following part of the September 26, 2003 Judgment Granting Divorce and Awarding Child Custody; Order Dismissing Third–Party Complaint:

7. *Plaintiff's and Defendant's Incomes.* For purpose[s] of calculating chi[l]d support and determining alimony, Defendant's income is imputed at $12.00 per hour, 40 hours per week for a total of $2080 per month plus alimony of $1,000.00 per month for a total of $3080.00 . . . .

8. *Child Support.* Pursuant to Child Support Guidelines attached hereto as Exhibit "A", Plaintiff shall pay to Defendant [as] and for the support of the parties' minor children the sum of $685.00 per child per month for a total of $1,370.00 per month. Said payments shall begin on October 1, 2003.

Payments shall be made in two installments of $685.00 each on the 15th and last days of each month . . . .

. . . .

10. *Alimony.* Commencing October 1, 2003 and until September 30, 2004, Plaintiff shall pay to Defendant as and for alimony the sum of $1,000.00 per month payable directly to Defendant in two equal installments of $500.00 each on or before the 15th and 30th of each month. From October 1, 2004 through September, 2006, Plaintiff shall pay to Defendant as and for alimony the sum of $750.00 per month in two installments of $375.00 each on the 15th and 30th days of each month. Alimony shall terminate upon the death of either party, Defendant's remarriage, further order of the Court, or September 30, 2006, whichever shall occur first.

. . . .

16. *Real Property.* The Court finds that Edward and Judith Haflich hold title to 552 Kumulani Drive, Kihei, Maui, Hawaii. The Court further finds that Defendant/Third–Party Plaintiff failed to establish by a preponderance of the evidence that Edward Haflich and Judith Haflich, Third–Party Defendants hold title to said real property in constructive trust for Elizabeth Haflich, Defendant/Third–Party Plaintiff. Therefore, **IT IS HEREBY ORDERED** that the Third–Party Complaint be dismissed.

(Emphasis in the original.)

We vacate Findings of Fact nos. 49, 50, 52, 53, 55, 63, 65, and 66 entered on May 20, 2004. We remand for reconsideration the child support and alimony issues.

We vacate FsOF nos. 80 through 106 entered on May 20, 2004. We remand for entry of an order dismissing the Third–Party Complaint for lack of subject matter jurisdiction.

In all other respects, we affirm.